Good morning, Your Honours. If it pleases the Court, Patrick O'Keefe for the Plaintiff's Appellant. Your Honours, the Appellant's contention that the lower court erred when it granted summary judgment dismissing the plaintiff's claims. We also contend that the lower court erred when it refused to accuse itself after a motion was made under Section 28 U.S.C. subsection 144. In this case, Your Honour, two summary judgments that were reviewed in the lower court. The first one was reviewed by Judge Mascot. Judge Mascot found that there were issues, triable issues that remained that needed to go to trial. She also found that there was, the plaintiff had a claim for malicious prosecution from the time of the arrest up until the time of the exploration of the grand jury minutes. She was not going to allow the plaintiff to argue malicious prosecution post-indictment. Two days before trial, a new summary judgment motion goes before Judge Donnelly. The facts remain exactly the same. There's absolutely no new evidence that was submitted to the court and the court now finds that there was no probable, there was probable cause to make the arrest and that there was probable cause so there's no malicious prosecution. Now, at this time, all the court had before it was testimony that was allegedly given at the grand jury, before the grand jury, which now changed everything. If the court should look at the case, the arrest happened approximately 13 days prior to the grand jury testimony. It's ground knowledge that false arrests takes time at the time of the arrest and not subsequent and it's based on the information that was available to the police officers at the time of the arrest. So, from the point of arrest up into the point of the case going before the grand jury, no facts changed. What we do have is that there was an arrest based solely... Is it possible for facts to come out at the grand jury, during the grand jury hearing, that have a bearing on what the officers knew 14 days, however, more, when the arrest occurred? Can it be used for that purpose? Not to find out what the facts were at the grand jury, but to find out what the facts were at the time of the arrest. I'll assume if the officer was psychic and could read back, but other than that, any testimony at the grand jury was not available to the actual officer at the time of the arrest. Also, the circumstances and information that came out at the time of the arrest was that the arrest was made based on a photo array. The photo array, which is page 51 on the records, clearly showed that the photo array was doctored by the police. So, when you have issues like this, any information that comes out subsequently, which was not available at the time of the arrest, is questionable. Excuse me. Wasn't the police officer relying on the testimony or his inquiry of DR? DR had been the person who called 911? Correct. And made a report on, he gave a physical description of the assailant? Correct. And location? Correct. And the police officer then went in and, after he talked with DR, he made the arrest? No. Incorrect. DR was a witness to the actual crime? Yes. There were several witnesses. It was involved. The police officers arrived at the scene of the crime and interviewed numerous witnesses. What was consistent was that all the witnesses stated that the perpetrator was a black female, middle-aged, with dreadlocks, loose dreadlocks. This was in a predominantly African-American neighborhood. There was no inconsistency with the description. All the police officers knew the description of the perpetrator. Two, either a woman in a mill or two females with loose dreadlocks. The defendant, the plaintiff that was arrested, had no dreadlocks. She was arrested approximately eight days later. She had no dreadlocks, had never had dreadlocks in her life. And she was arrested after the photo array was examined by DR? Yes. And DR identified her? Yes. So DR identified her as someone he knew from the park. DR lived in the neighborhood. The plaintiff also lived in the neighborhood. She was a wife of a police officer and had four kids. DR grew up with her kids. They all knew who she was. He identified her as someone he knew from the park. And that's all he wrote in the photo array. The second witness that came in did not identify her from the photo array. After the police officer left the photo array, he added to the photo array line-up sheet, which is page 54, the person that shot the boy right in the park. You mean 51? 51. So that language was actually added by the police officer, which means at the time of the arrest, the only information that was available to the police was that. So what was the purpose of the photo array? What was the purpose of showing DR the photo array? I mean, if you're right, are you also suggesting that the circle around number five, which apparently is a photograph of your client, was by the police officer or by DR? No, it was by the police officer. He actually admits doing it. So what is this photo array? What part of it, the DR? DR wrote his name, Dylan Rickman, and wrote in the park, which is two lines down. So the signature, that's his? Yes, and then he signed it. Now, after they left the room, the police officer added, shot the boy Rhino. No, no, no, no, no, no. But the five, that's the police officer and not DR? No, that's DR identifying as someone he knew from the park. What was added to it was shot the boy Rhino. Now, if your owner looks at it in the park, that in itself, knowing someone from the park is not a crime. Now, if the court will look at page 64, which is a lineup, which happened a few minutes after, again, when they asked him where he knows. 64? Yes. Okay. That's a lineup. Yes. Again, when they asked the same witness, DR, where he knows the plaintiff from, again, he says from the park. And this is actually witnessed by the police officers. If you go back to page 51, where the police officer doctored the document, after doctoring it, he didn't sign it. It has a space for the officer's signature. Mr., I guess the officer says at 61, he was asked what number he recognized. He picked number, oh, I'm sorry. 64. 64. I see. It's a lineup sheet. Okay. It's CA-64, Volume 1. Okay. So, at the bottom of the lineup sheet, when asked where the witness knew the appellant from, he again responded from the park. Where is the testimony? I'm just looking for the testimony that relates to that photo array that you showed us, or that you pointed us to, where it explains why he circled 5. Because usually there is, just in my experience at least, you don't show someone a photo array and say, was this person walking around in the park? But maybe I'm wrong. No, from, we interviewed, well, we took a position transcript from two officers. The officer that actually presented the photo array, and the officer that was with him at the time when he presented the photo array, the photo array. The officer that presented the photo array, Detective Carl Boyan, stated that he presented it and asked the witness where he knew the plaintiff from, and the plaintiff said from the park. He also testified that the plaintiff subsequently told him that that's the person that killed the victim. Now, when asked why didn't the plaintiff write this in himself, he said he couldn't remember. He was then asked why, why did he, he was asked who wrote this in, and the detective said he wrote it in. And who circled the number? The detective said he wrote the number in. He was then asked if that was like standard normal police procedure, for you to fill it out, and he said, well, it didn't really make a difference. He was then asked, well, on the page, it has a space for officer's signature, on page 51. So, after he filled it in, he didn't sign it, and then skipped, and filled in the other information. So, he was asked why he didn't sign it, and he said he couldn't give an explanation. He simply forgot. Now, if you go to page 64, which is a lineup, which happened between a few minutes later, the court can see that when asked where the witness knew the plaintiff from, he states from the park. Where is that? It's at the bottom right-hand corner. Where do you recognize him? From the park. Okay, from the park. He's then also signed and witnessed by the officer. There's a space for the officer's signature. Now, put this together with the fact that you had numerous witnesses that told these same officers they were looking for a middle-aged lady with dreadlocks. They arrest a wife of a police officer that has no prior interaction with the law, has four kids, no history of allegedly shooting someone that's 25 years younger than her. There's no connection whatsoever. During their depositions, they were repeatedly asked if they could give descriptions of someone that they know that has dreadlocks. They said Bob Marley, Woodward Goldberg. My client had an Afro. There's no way you go from having dreadlocks to having an Afro in eight days. You had numerous witnesses in the park that saw this crime occur, and they all described the perpetrator as having dreadlocks. That is the one consistent description that came out from all the witnesses in the park. How do you now go to a police officer's wife? I apologize for my ignorance. Wasn't there also somewhere someone who said that she had cornrows? Or are you making that up? She had four cornrows, and that's the picture you see in the photo at the time of her arrest. At 51, that shows cornrows. It's not a clear picture. It's picture number five on page 51. Correct. Yeah, yeah. I mean, she has cornrows in that picture, but it's not clear. But it's not cornrows. It's cornrows where her hair was braided in four braids just short to the back. But you had descriptions of the perpetrator having loose dreadlocks, long, loose dreadlocks. But dreadlocks aside, there was a witness at the grand jury, D.R., who's also participated in the lineup, and he said that Ms. Nicky was, in fact, the shooter. So D.R. was. And the real question is, if he said that, and I think he did, doesn't that validate the police officer's arrest that didn't have probable cause then? No. And the reason why is because D.R. was interviewed. He called the police. He was one of the 911 callers. He was interviewed within 24 hours after the incident at the scene, and he gave a description of the shooter, which didn't match Ms. Nicky. He also testified that two people with dreadlocks ran into a specific building, and he had no idea who they were. He had never seen the shooter before. He was interviewed again four days later at the DA's office, and he repeated the same testimony. Let me just back up because I'm now a little confused. You showed us 51. That happens prior to her arrest. Correct. Okay. And at the very least, 51 suggests, understanding that there's testimony maybe about it, but it suggests that he identified your client as someone who was in the park. Correct. And that was part of a photo array cobbled together by the NYPD to figure out who had shot this victim. Is that correct? No, Your Honor. All right. So what was the photo array for? Shouldn't that be a yes, though? No, the photo array was like. . . The photo array wasn't to identify who was in the park. It was who was the shooter. No, the photo array was a setup to arrest a plaintiff. By the time they went to D.R. to point someone out in the photo array, they were already targeting the plaintiff. So I understand your view, but I'm just trying to understand the basic fact, which is was there testimony about why they showed D.R. the photo array? No. So you have a photo array presumably about someone in the park, and it's the police officer who says that D.R. informed him this is the person who shot her in the park, shot the victim in the park, and the police officer writes that down. Correct. Why isn't that probable cause? Because you have inconsistent testimony from the other officer that was in the same room as him. He said they were in a small room. They were standing right next to his colleague when D.R. said he knew the witness from the park. He knew the plaintiff from the park. The same officer was asked, well, when was this written in? He said he wasn't sure. Is it possible that it was written in after he left there, after he left meeting with D.R.? He said yes. When was the first time you saw shot the boy or rhino in the park when we got to the precinct? That means that D.R. had already signed the photo array as someone he just knew in the park. The statement, shot the boy or rhino in the park, was added after he left D.R., and it was never signed, it was never witnessed. So you have a document which reports that this person picks out this person that he saw shooting someone in the park, but they're acknowledging, the police are acknowledging that the witness never said that or never wrote that in. He never signed that. It was added after they left the room, and there's no signature on it. So you don't need to truly know who signed it or what the basis were for adding it. If the officer got that information from the witness, he would have signed it. His signature line was there, but he skipped it, filled out the rest of the information, intentionally not signing it. Well, maybe our confusion will be, or maybe my confusion, I'll speak for myself, will be cleared up by Ms. Gustafson and by you on rebuttal. So thank you very much. Good morning, Your Honors, and may it please the Court. Ingrid Gustafson, appearing on behalf of the defendants in this case. I think the best place for me to start is on page 53 and 54 of the record. And if I may read the testimony to Your Honors. The question is, Detective Carbowin, I want to take you to the confidential joint appendix page 53. That's correct. Detective Carbowin, I want to take you back to the photo array that you were questioned about. Who did Mr. R identify at that photo array? Answer. Number five, the female in the number five position, Veronica Nicky. Question. Did he say why he identified her? Yes. What did he tell you? That was the person that shot the boy, Rhino, in the park. And did he have an opportunity to review the portion of the photo array that you wrote down? Yes. And at what point in connection with that did he sign the document? After I filled out the part where I put in his name and address, that he identified photo number five, and also that I put down his response to my question. And his response was, they shot the boy, Rhino, in the park. I put down the incident number, the date, the time, and I handed it to Mr. R. So Mr. R signed it after you wrote the information on the sheet. Yes. Your Honor, the evidence in ---- That answers my question. Yes. There is no evidence, no non-speculative admissible evidence in this record, that an identification of the plaintiff in this case as the shooter did not occur at the photo array. The testimony that plaintiff is here relying on to try to create an issue and to state repeatedly that this was a doctored photo array as a fact, as though it was an admission, is testimony that was given by the other officer who was at the photo array. And that testimony appears on page 142 and 143 of the record. Okay. I'm there. Through 145. And if I ---- if Your Honors will allow me to summarize this testimony instead of reading the four pages from the record. The question ---- it's undisputed here that Detective Carbwin was the one who filled out the photo array in the sense that he wrote in his name, he wrote in the response that was given by the plaintiff, he circled who had been identified by the eyewitness. There's nothing ---- there is nothing nefarious about that. The clear testimony was that the signature happened after all of that occurred. In pages 142 through 145, plaintiff's counsel is asking Detective Coward, who was the other officer involved, a series of questions about what he remembers from the photo array. What did you see ---- did you see the other officer write down this phrase? And he repeatedly states over and over again, I don't ---- I don't remember. I wasn't standing there. We have to remember this was four years ago. I don't know who wrote what. And after saying over and over and over again, I don't remember, plaintiff's counsel asks whether the speculative question that is objected to by counsel, is it possible that Detective Carbwin filled in the statement later and dismissively that Detective states anything is possible. This is ---- he's ---- this is just an affirmation that he doesn't remember exactly what happened. This sort of metaphysical speculative doubt, there is no admissible non-speculative evidence in this record that this ID did not occur. I would ask Your Honors to read the record in context. It's established that that deposition testimony should not be taken out of context to manufacture an issue of fact. Based on this photo array, based on the subsequent lineup, based on the grand jury testimony, there is no triable issue of fact as to whether this identification occurred. All of the arguments made by plaintiff's counsel are based on speculation. I would like to ---- the only other issue raised about probable cause by plaintiff here is the difference in hair style. And because the officers here have qualified immunity, the question to be determined on that issue is would no reasonable officer have thought that there was probable cause to arrest the plaintiff here because her hairstyle was different 11 days after the crime occurred? And the answer is no. Hairstyle is a mutable characteristic. We have here a positive identification by an eye, an eyewitness, which suffices to show probable cause. I would like to briefly address the recusal issue, if I may. Your Honor, taking again, taking all ---- looking at all of the facts and circumstances surrounding the ---- what happened at the end of the case here, there is no ---- there was no basis for recusal here. Whether something could have been done a little bit differently is not the relevant question, just whether someone would doubt the partiality of the judge. And certainly not here. I mean, this happened because time was of the essence. It happened because plaintiff asked for reconsideration of a ruling that had been the law of the case for 3 years. And the judge ruled in his favor, which hardly shows that she was biased against  It was noted on the record that exact same day. At bottom, the claim of prejudice from the discovery of the grand jury minutes here is that the grand jury minutes affirmatively disproved plaintiff's theory of the case. And but the grand jury minutes are what they are. And an opportunity to keep out these grand jury minutes, which affirmatively disproved plaintiff's theory of the case, is not a recognized form of prejudice. An opportunity to subvert the truth-seeking function of trial. These grand jury minutes changed the context of the entire case. Whatever inconsistencies Judge Mauskopf saw at the beginning of the case, which she characterized herself as, quote, seeming inconsistencies, were merely based on ambiguities in the record. Reasonable inferences are determined based on context. Once you have these grand jury minutes that show the eyewitness in this case making a clear identification of the plaintiff here as the person who was ID'd at the lineup and saying that, yes, that was the shooter in the park. It's not reasonable based on the speculation and the innuendo that plaintiff seeks to draw to determine that this identification did not occur. You say Ms. Kopsis said it might have been done better. How should it have been done, the disclosure that Judge Donley asked her clerk to make to one side and not to the other? I don't actually, even if it could have been, I don't know necessarily how it would have been. I'm not sure there is anything wrong with a clerk, you know, calling about this issue and notating it simultaneously on the record. It could maybe both have been on the phone possibly. But the issue is whether or not someone would doubt the judge's impartiality. And I think certainly not under these circumstances. But at bottom, yes, Your Honor? There is something in the record about subsequent statements written and otherwise by D.R. Duane. Oh, the lineup. Yes, the in the park issue. I mean, this is being taken entirely out of context. I think it's clear that Detective Coward is using in the park as shorthand. I'm asking whether there are statements ostensibly by D.R. that happened subsequently and that appear not to be relevant for this argument. I just wanted to give you a chance to comment on that. Absolutely not, Your Honor. The only statements by D.R. in the record is the grand jury testimony. And then we have the testimony of the officers here communicating what was told to D.R. I mean, the only other thing from D.R. are the affidavits. Do we have testimony from D.R. that he recants his grand jury statements? He no, Your Honor. We have D.R. refusing to testify at the criminal trial in the record. He does not state why. His attorney states that he has a tremendous fear of testifying, but certainly not recanting his grand jury testimony. If Your Honor is referring to the affidavits, those affidavits have been so thoroughly debunked, I don't see how they could possibly support material issue effect here. And they were directly contradicted by the grand jury testimony. In those affidavits, which the affidavit we're talking about was filled out by counsel prior to even meeting with D.R., and that affidavit said, I have never, ever said or connected to anyone, ever, the plaintiff here, to this crime. I only said it was in the park. Once you have the – those were actually rejected by Judge Moutzkopf way back at the beginning of this case. But once you have the grand jury testimony showing those to be false, they cannot create a material issue effect. Furthermore, you have the issue that when the parties went to the correctional facility here and tried to depose the eyewitness and was asked, are these affidavits correct, he responds, I don't know, and I refuse to testify, which for me is an essential repudiation of them, and also indicates that he is never, ever going to appear. You repeat – and it was – in the criminal trial, he was held in contempt, so he has a proven record of not appearing. He said, I'm not – I will not testify. I will not appear. So I failed to see what on this record, what evidence is going to go before a jury to show that this identification didn't occur. We don't have D.R. The affidavits are here, say, and have been completely debunked. The officers, both McHugh and Detective Carbowin, said – first, Detective Carbowin at the photo array and second, McHugh at the lineup – that the eyewitness said, this is the person who shot the victim in the park. And all we have is Detective Coward's testimony, who is saying, in the park, in the sense that, yes, he identified her from the park. And taking that – that's not inconsistent with an identification of shot this person in the park. It's just being taken out of context to manufacture an issue of fact. Plaintiff's theory at this point seems to be, well, yes, D.R. may have identified her before the grand jury, but, you know, it didn't before – you know, we can reasonably assume that didn't happen at the photo array. There is no evidence beyond speculation in this record. And I would encourage, Your Honors, to look in context at any of the testimony that is cited by my – absolutely. Any questions for Carbowin? I have to admit I'm not entirely sure. I apologize. I heard debate in my chambers, and I thought we would settle it. But not now, I guess. My apologies. All right. Thank you very much, Your Honors. Your Honor, real quickly, depositions of these officers took place in 2012, which is approximately four years after the alleged crime occurred and after Plaintiff was arrested. At those depositions, they both stated from the park. The photo array sheet states from the park. You've all heard that Detective Carbowin say that based on the information given to him that he filled it out and signed off on it, and that's what the witness told him. But this was in 2012, four years after the crime. Detective Coward, who was in the same room with Detective Carbowin at the time, testified before a weight hearing in 2009. And in 2009, as the Court looks at page MCA 251, when asked – now, sir, you showed that to Mr. Rickman. What if any instructions did you give him prior to showing him that particular photo array? I asked him to look at it, and does he recognize anyone from the park? And, okay, and what did Mr. Rickman say when you displayed it to him? He said yes. Did he indicate that position he recognized someone? Yes. That position was what, sir? Number five. The problem here is that you no longer have Detective Carbowin handing over this photo array to the witness. You have an entirely different officer. And this was in 2009 under oath in court. Detective Carbowin testified four years later, and now he claims that he's the one that presented it. And all of a sudden, Detective Coward, who previously testified in the court that he was the one that presented it, now has amnesia, doesn't remember what was signed in the room and if anything was signed or when he first saw it. And in this, he tells the court that all Mr. Rickman said was from the park. So you have a document. You have Mr. Rickman giving statements saying that all he said was that he knew the witness from the park. You have an officer that was in the room when that photo array was presented, telling the court under oath that Mr. Rickman only said he knew the plaintiff from the park. You have another defendant officer stating that Mr. Rickman did not write, shot the boy rhino. He wrote it in. And then you have officers saying they're not sure when it was written in. You have a plaintiff that does not fit the description of the shooter. You have numerous people giving the same officers the same description. You arrest someone without dreadlocks. What page was that transcript? Page 251, and it's from the Wayne hearing on the testimony of Detective Coward. If I may move on to the recusal issue, we had, when this issue came up, I told the defendant's counsel that I was immediately going to move for recusal. Within 30 minutes, we received an order saying that we should file, we should answer an OSC on why the case should not be dismissed. Now, appellees received a phone call from chambers. They filed a motion. We had seven days to put in a response. Before we could put in a response, they received a phone call from chambers instructing them on what to do and where to go file certain papers in court, in state court. We were supposed to start trial two days from then. Now, based on that phone call, we are now standing before this court. So, obviously, there was a tactical advantage to the appellees. If not, we would not be before this court right now. The case would have been tried. Further, based on the motion that we made for the lower court to recuse itself, it should have recused itself and handed the case over to another judge. None of the facts have changed between what Judge Moskop saw and what was presented to the judge generally, besides what was allegedly said before the grand jury. What do you mean allegedly said before the grand jury? Is there any doubt that it was said before the grand jury? Pardon? Is there any doubt that what the judge said? Yes, there is. Really? Yes. The witness that testified before the grand jury was made certain promises. It was going to be secret. He just had to lie, and he wouldn't – they would never have to know about it. But at trial, he refused to testify because he was not going to incriminate an innocent person. And that's why he didn't testify in the criminal case. There were promises made to him that, listen, just say this in the grand jury. No one's going to know, and that's it. But they couldn't convince him to do that in the trial. Well, he'll have to take a stand and say that. We at least have the right to cross-examine the prosecutor. Do you have any proof of that, Mr. Kagan? Pardon? It's not. About his lying because the grand jury proceedings are in secret. We have the right to cross-examine the DA on that theory if he takes a stand. We also have the right to cross-examine the officers on the circumstances, but when you put all these circumstances together, there is clearly an issue of fact that needs to go to a jury. You have statements from the witness, recanted in his testimony from the grand jury, stating that the police forced him, the police and the DA forced him to lie, or they'll punish him in his case. In his statement, he says he got 10 years for refusing to testify against Nicky for stealing a cell phone. So that was his first crime, no prize, and he was given 10 years. And the ADA, in this case, came in during the Nicky trial and said that because of this person, the murderer went free. So he was now punished. He got 10 years on his first crime for stealing a cell phone. All right. Thank you very much.